# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**FARO TECHNOLOGIES, INC.,**

        **Plaintiff,**

-vs-                                   **Case No.  6:05-cv-1702-Orl-31JGG**

**CIMCORE CORPORATION; ROMER,
INC., and  HEXAGON HOLDINGS,  INC.**
                        **Defendants.**
_____/

# ORDER

This matter comes before the Court on the Defendants' amended response to the order to show cause why certain documents should remain under seal.  (Doc. 53).

## I.      Background

On December 8, 2005, Defendant Hexagon Holdings, Inc. ("Hexagon") filed a motion to dismiss (Doc. 17) for lack of personal jurisdiction.  On February 10, 2006, the Plaintiff, Faro Technologies, Inc. ("Faro"), filed a timely, redacted memorandum in opposition (Doc. 42) to Hexagon's motion to dismiss, as well as an assented-to motion to file an unredacted version of its response under seal (Doc. 41).  On February 16, 2006, the Court granted the motion to file under seal and ordered the Defendants to show cause in writing by March 3, 2006 why Faro's response to the motion to dismiss should remain sealed.  (Doc. 45).  On February 21, 2006, Faro filed the unredacted version of that response under seal.[1]

_____

[1]As the document was filed under seal, it does not have an identifying docket number.  It appears on the docket as "Sealed document #1" (henceforth, "Sealed Doc. 1"), immediately after docket entry 46.

Hexagon then filed two motions: one seeking leave to file a reply to Faro's response (Doc. 47) to the motion to dismiss and another seeking to file excerpts from the deposition of William Gruber ("Gruber") under seal (Doc. 48).  On March 2, 2006, the Court granted both motions, directing Hexagon to file the entire Gruber deposition under seal, along with an explanation as to why any portions of that deposition ought to remain under seal.  (Doc. 50).  Hexagon subsequently filed its response to the order to show cause (Doc. 51)[2] and the Gruber deposition (Sealed Doc. 2), as well as a redacted version (Doc. 59) of its reply to Faro's response to the motion to dismiss. Hexagon subsequently sought (Doc. 60) and received (Doc. 63) leave to file portions of that response under seal, which it did on March 21, 2006 (Sealed Doc. 3).

The parties also moved for a protective order (Doc. 52) allowing them to file under seal without further court order any information either party has designated as confidential (along with a publicly filed redacted version).  On March 28, 2006, the Honorable James G. Glazebrook denied the motion.  (Doc. 67).

## II.     Standards

The press and the general public have a constitutional right of access to criminal trials, embodied in the First Amendment and applied to the states through the Fourteenth Amendment. *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 603 (1982). Underlying the First Amendment right of access to criminal trials is the common understanding that a major purpose of that Amendment was to ensure that the individual citizen can effectively

---

[2]Because its initial response was not signed, Hexagon subsequently filed an amended version (Doc. 53).

participate in and contribute to our republican system of self-government.  *Id* at 604.  "Thus to the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one."  *Id.* at 604-05.  Two features of the criminal justice system together explain why a right of access to criminal trials in particular is properly afforded protection by the First Amendment.  *Id.* at 605.  First, criminal trials have historically been open to the press and general public, and this tradition of accessibility implies the favorable judgment of experience.  *Id.*  Second, this right of access plays a particularly significant role in the functioning of the judicial process and the government as a whole.

> Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole.  Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process.  And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process – an essential component in our structure of self-government.  In sum, the institutional value of the open criminal trial is recognized in both logic and experience.

*Id.* at 606.

The Supreme Court has not had occasion to assess the existence of a First Amendment right of access, if any, to civil proceedings.  However, it is settled that a common law right of access exists as to such proceedings.  *Wilson v. American Motors Corp.*, 759 Fed.2d 1568, 1570 (11th Cir. 1985) (citing *Craig v. Harney*, 331 U.S. 367, 374 (1947)0.  Therefore, the starting point in deciding whether to restrict access "is the proposition that, absent some exceptional circumstances, trials are public proceedings."  *Brown v. Advantage Engineering, Inc.*, 960 F.2d 1013, 1015 (11th Cir. 1992).

Although a number of factors exist that might militate against public access in a particular case, a presumption of open access to civil trials and the records of such proceedings preserves the public's right to monitor the function of the courts. *Wilson* at 1570. When courts attempt to deny access to such records in order to inhibit the disclosure of sensitive information, it must be shown that the denial is "necessitated by a compelling government interest, and is narrowly tailored to that interest." *Id.* at 1571 (internal citation omitted). Simply showing that the information would harm a company's reputation is not sufficient to overcome the strong common law presumption in favor of public access. *Id.* at 1570-71. In determining whether to seal public records at the parties' request, the Court must "keep in mind the rights of a third party – the public, 'if the public is to appreciate fully the often significant events at issue in public litigation and the workings of the legal system.'" *Id*. at 1571 (quoting *Newman v. Graddick*, 696 F.2d 796, 803 (11th Cir. 1983)).

In *Wilson*, the parties sought, by way of a settlement, to seal all records of the case, including pleadings, motions, and evidence that had been part of the public record throughout the proceedings. *Brown* at 1015. The *Wilson* case had proceeded through trial, while the *Brown* case never settled before the trial, but the Eleventh Circuit held that that distinction did not affect the applicaple analysis. *Brown* at 1015. The *Brown* court went on to explain that

> It is immaterial whether the sealing of the record is an integral part of a negotiated settlement between the parties, even if the settlement comes with the court's active encouragement. Once a matter is brought before a court for resolution, it is no longer solely the parties' case, but also the public's case. Absent a showing of extraordinary circumstances set forth by the district court in the record consistent with *Wilson,* the court file must remain accessible to the public.

*Id.* at 1016.

However, discovery material and proceedings are not public components of a civil trial. Such proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984). Restraints placed on discovered, but not yet admitted, information are not a restrictions on a traditionally public source of information. *Id*. Within this Circuit, different access standards apply to admitted material, depending upon the context in which it was provided to the Court. "[M]aterial filed with discovery motions is not subject to the common-law right of access, whereas discovery material filed in connection with pretrial motions that require judicial resolution on the merits is subject to the common-law right." *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312 (11th Cir. 2001).

## III.   Application

As Judge Glazebrook pointed out in his order denying the motion for a protective order (Doc. 67), motions to file under seal are disfavored and will only be granted upon a showing of extraordinary circumstances and particularized need.  (Doc. 40 at 5).  The Defendants have not made such a showing.

The Defendants argue that the information they seek to keep under seal is confidential business information, disclosure of which would harm Defendants' business interests.   They also contend that neither their internal affairs nor the instant suit are of particular public interest – at least not sufficiently so that it would warrant involuntary disclosure of the Defendants' confidential business information.  The Defendants also argue that they deserve special

consideration because it was not their choice to bring this suit in the first place or to inject the their

confidential information into the personal jurisdiction dispute.

According to the Defendants, all of whom are privately owned, their "internal structure,

organization, and financial information are all private, and are not subject to disclosure in

regulatory filings," and disclosure of such information would place them "at a competitive

disadvantage by revealing proprietary information about how they structure and run their

businesses." (Doc. 53 at 5).  Furthermore, the Defendants contend, "[p]ublication of Defendants'

private and confidential financial information would also give their competitors an unfair

competitive advantage by allowing them to determine the commercial success of Defendants'

products, the strength of Defendants' market position, the success of Defendants' marketing

techniques, and the ways in which Defendants might be most vulnerable to competition." (Doc.

53 at 5).

It is doubtful that such concerns, even if certain to occur, could ever constitute the

"extraordinary circumstances and particularized need" required to justify an order to seal such

otherwise mundane information.  Publicly held companies routinely divulge organizational

information and details such as revenue and sales figures without noticeably impairing their ability

to do business.  Yet the Defendants claim disclosure of that information would "severely

compromise" their "competitive position" by "revealing the strengths and weaknesses of

Defendants' market position and competitive information about consumer demand for Defendants'

products." (Doc. 53 at 6).  Even if such a crippling result were theoretically possible, there has

been no showing that the information that the Defendants seek to seal is particularly difficult for their competitors to ferret out or particularly useful if they were able to do so.[3]

The Court is sympathetic to the Defendants' desire to keep their competitors in the dark as much as possible.  And the Court understands that Hexagon and the other Defendants did not initiate this suit or the discussion of confidential information.  Now that the Defendants are here, however, they are no longer solely in charge of determining what information may be revealed, or must be revealed.  The public's interest in monitoring the functioning of this Court outweighs the Defendants' interest in denying their competitors every potential advantage.

The Court therefore intends to order that all three sealed documents be unsealed.  However, if the Defendants are convinced that the information contained in those documents would significantly harm them if made public, the Court will permit them to avoid its release by withdrawing Hexagon's motion to dismiss.[4]  (Doc. 17).  If Hexagon notifies the Court not later

---

[3]As an example, the Defendants make the following argument in regard to certain passages from one deposition:

> Mr. Gruber's testimony on pages 140-45 regarding the ownership and interaction among Hexagon Holdings and its subsidiaries is also confidential (particularly pages 140-41, 142:11-15, 142:23 - 143:9, 144:24 - 144:5).  Revealing this information would harm Defendants by allowing competitors or suppliers to exploit these relationships in contract negotiations.  It would also allow competitors to gain an unfair advantage by copying relationships or organizational structures that have given Defendants a competitive advantage in the past.

(Doc. 53 at 9).  As is the case with the other passages they seek to seal, the Defendants do not demonstrate any way in which the relationship between Hexagon and its subsidiaries is particularly difficult to uncover or sufficiently novel that a competitor might benefit significantly by doing so.

[4]Such a withdrawal would not affect the dismissals of Hexagon Metrology North America and Romer Cimcore.  (Doc. 44).

than 5:00 p.m. on Monday, April 10, 2006 that it is withdrawing that motion, the Court will order

the sealed documents stricken and returned to the filing parties.  Otherwise, the Court will order

the documents unsealed and may rely on them in resolving the motion to dismiss.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on April 4, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party